[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the judicial district of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff, whose maiden name is Adeline Forlivio, and the defendant were married on August 20, 1984, in New Canaan, Connecticut. The plaintiff has resided continuously in the state of Connecticut for at least twelve months immediately prior to the date that the complaint was filed. There are no minor children issue of the marriage and no minor children have been born to the plaintiff wife since the date of marriage of the parties. Neither party has received state assistance.
The plaintiff, in the amended complaint, alleges intolerable cruelty as a grounds for the breakdown of the marriage. The defendant, in a cross complaint, alleges irretrievable breakdown as the grounds for dissolution.
The parties are in dispute as to whether their sexual relationship was consensual or nonconsensual. The plaintiff claims that it was nonconsensual, while the defendant claims that it was consensual. This issue was fully litigated. From the evidence presented, the court finds that the sexual relationship between the parties was consensual throughout the marriage. The defendant struck the plaintiff on one occasion in 1986. He has grabbed her arms on approximately three occasions. From the evidence presented, the court finds that the marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation and that each party is equally at fault for the breakdown of the marriage. The court finds that the defendant has not been guilty of intolerable cruelty to the plaintiff. CT Page 7617
The parties resided together for twelve years from the time they married until 1995. They were living at 71 Deer Run, Bethel, Connecticut when they separated. The plaintiff still lives at that residence.
When the parties separated in 1995, they had approximately $3500 in a joint account. One thousand dollars of it went to the defendant to use for getting his new apartment. Two thousand five hundred dollars of it went to the plaintiff for attorney's fees.
The plaintiff has a high school diploma. She is forty-three years old and in general good health. She takes antidepressant medication that is prescribed by her psychiatrist. She commenced taking it approximately one to two months before the defendant vacated the marital residence in 1995. The antidepressant medication that the plaintiff takes is covered under the defendant's health plan for 80 percent coverage. The plaintiff did not have any savings at the time of her marriage to the defendant. The cost to maintain COBRA health insurance for the plaintiff, after the dissolution is granted, would be $368 monthly.
The plaintiff has a 401K plan for the period of time she was employed at New Canaan Lumber from approximately 1982 to approximately 1992. The plaintiff presently has a net weekly income of $157 and total weekly expenses of $308. Her mother gives her money to make up for the shortfall. She does not have any liabilities. She owns a 1997 Subaru with a value of $17,000 and a loan balance of $5000, and an equity of $12,000. She sold the previous car that she owned for $5000. Her mother gave her the balance of the money to purchase the Subaru except for a $5000 car loan that she presently has. The plaintiff has $200 in the Danielson Savings checking account. The plaintiff's 401K plan has a value of $32,547.61. The plaintiff has $1338 in a bank account at First Union with her mother.
The plaintiff worked for the New Canaan Lumber Company commencing approximately 1982 until 1992, for a total of approximately ten years. The plaintiff was an assistant manager at the New Canaan Lumber when the parties married, earning $10 an hour for a forty-hour workweek. The position included full medical and pension benefits. The reason the plaintiff left New Canaan Lumber was due to a general layoff caused by lack of work. After her position at New Canaan Lumber, the plaintiff received CT Page 7618 unemployment compensation. During this period of time, she assisted in caring for her father until he died in 1992. She then started looking for employment. Her next job was with Home Depot earning $10 hourly working full time. She worked there for less than one year. That position included medical coverage. Her hours varied including working from 9 a.m. to 5 p. m., and from 4 p. m. to midnight. Her hours at New Canaan Lumber were Monday through Friday from 8 a.m. to 5 p. m. At Home Depot, she also would work on Saturdays and Sundays on occasion. The plaintiff left her employment at Home Depot in approximately 1995, and then went to work at the Bethel Food Bank, which is a grocery store in Bethel. She worked in the deli department earning $7 hourly. The job included working on occasion until 9 p. m. and also weekends. The defendant felt that the plaintiff's skills were better than were called for at her job at the Bethel Food Bank. She left that position and obtained a position at New Canaan Town Hall in the parking authority on March 7, 1995. She continues to work there to the present time earning $10.67 hourly. The position is not full time. She was told it would be full time when she was first employed there on March 7, 1995. She is also employed part time as a matron in the New Canaan and Bethel police departments. That work entails being present when there are female prisoners and is only done two to three times yearly. She earns $16 hourly in her matron employment with the town of New Canaan, working approximately fourteen to sixteen hours a year. She earns $7 hourly working at her matron employment for the town of Bethel. She does not have medical or pension benefits with her present employment. The parties are in dispute as to whether the defendant wanted the plaintiff to leave her various employment positions following her New Canaan Lumber position due to the number of hours that were involved or the nature of the work. The court finds that there was no attempt by the defendant to restrict the type of work the plaintiff could engage in or to restrict the hours that she could work.
The defendant will be forty-two years old in July of 1997. The defendant had been in the United States Navy and was discharged in 1981. The defendant started to have anxiety attacks in August of 1991. He saw a psychiatrist between November, 1991 and August of 1995. The defendant has a number of health problems including myoglobinuria, a crushed disc in the neck between C5 and C6, resulting in the disc being removed. He presently sees a chiropractor once a month for problems with his neck and back. He is on medication regarding his anxiety attacks. CT Page 7619
The defendant's employer matches the defendant's pension contribution. The defendant receives a gross of $56 weekly from the Naval Reserve and a net of $43 weekly. He will have to retire from the Naval Reserve at the end of 1997. He will then receive a retirement commencing at age sixty from the navy. He has six years of active duty and sixteen years in the reserve, for a total of twenty-two years. When he is sixty years old, he will receive approximately 26 percent of his base pay for retirement. The retirement from the navy is based on 20 percent of his net weekly pay at age sixty. Based on his present weekly pay, his retirement from the navy will amount to approximately $11.18 weekly. He has liabilities as shown on his financial affidavit. He owes Norwalk Savings Society a balance of $1565. The original amount of the debt was $3500 and was used towards paying attorney's fees. He owes City Bank VISA $7000. That was incurred for household expenses. The "other personal property" shown on his financial affidavit with a value of $600 consists of a TV, microwave and an air conditioning unit. The defendant has a 401K plan with a fair market value of $44,256. The defendant's present annual salary is $58,000. He also receives a bonus of approximately $650 annually around Christmas time. The defendant's financial affidavit dated May 30, 1997, shows a weekly cable expense of $39. The $39 is his monthly expense, not his weekly expense. He shows a weekly expense for hobbies of $15. That amount is corrected to $5 weekly. The remaining weekly expenses shown on his financial affidavit are accurate.
The defendant was employed, at the time the parties married, for Thompson ESF. After the defendant left work for Thompson ESF, he was employed in July, 1987, by Quantel in Stamford, Connecticut, where he still works. The defendant has been employed at Quantel for approximately nine years. He has medical coverage. The defendant does not hold an executive position with his present employment. He is presently on six-months probation due to poor job performance. The only period of time that the defendant was unemployed was an approximate three-week period between the time he left Thompson ESF and the time he obtained employment with Quantel.
The condominium the parties own was purchased in 1986. The purchase price was $118,900. The $60,000 down payment came from funds provided by the plaintiff's parents. The plaintiff's parents also paid the closing costs, points and attorney's fees towards the purchase of the condominium. A mortgage of $60,000 was obtained to complete the financing of the purchase. None of CT Page 7620 the funds of the plaintiff or the defendant were used towards the purchase of the condominium. The title to the property was initially taken in the name of the plaintiff and her father. Her father quitclaimed his one-half interest in the condominium to the plaintiff in 1990. She transferred one half of her interest in the condominium to the defendant in 1994. The condominium mortgage had a balance of approximately $55,000 in 1990, and was paid in full at that time. The funds for the payment of the mortgage came from the plaintiff's father, after he learned he was dying from cancer. During the period of 1986 to 1990, the parties jointly made the monthly mortgage payments on the condominium. There were not any significant improvements made to the condominium from the time it was purchased. From the evidence presented, the court finds that the fair market value of the condominium is $108,000. The defendant vacated the marital residence on Memorial Day 1995, approximately three months prior to the time that divorce papers were served upon him. The parties resided with the plaintiff's parents for approximately eighteen months prior to the time the condominium was purchased. They paid rent of $400 monthly which her parents set aside and then used that $7200 towards the down payment for the purchase of the condominium.
The plaintiff purchased a new Ford Taurus automobile for the defendant in 1989, with financial help from her father. A Chevette that was owned by the defendant at the time was sold for approximately $400 to $500. Her father provided $10,000 to be used for the purchase of the Ford Taurus and an additional $5000 came from joint savings. The vehicle was purchased as a birthday present for the defendant. The defendant subsequently sold the Ford Taurus and used the proceeds towards the purchase of a 1994 Honda Accord. He had used the Ford Taurus for approximately five years before selling it. When the Taurus was purchased, title to the vehicle was put only in the plaintiff's name.
The following table shows the income of the parties between 1984 and 1995.
INCOME SUMMARY
 HUSBAND WIFE TOTAL NET
1995: $56,876 $12,867 $69,743 interest 132 State/fed taxes, FICA (19.448)
CT Page 7621 50,427
1994: $50,802 $8,016 $58,818 interest 61 State/fed taxes, FICA (15.251)
43,628
1993: $47,991 $7,010 $55,001 interest 90 State/fed taxes, FICA (14,992)
40,099
1992: $45,767 $266 $46,033 unemp. $ 9,158 interest 240 State/fed taxes, FICA (13.326)
42,105
1991: $42,003 $13,193 $55,196 unemp. $ 5,061 interest 332 State/fed taxes, FICA (14,722)
45,867
1990: $41,366 $24,018 $65,384 interest 658 State/fed taxes, FICA (15,853)
50,189
1989: $37,684 $26,573 $64,257 interest 600 State/fed taxes, FICA (15,401)
49,456
1988: $35,957 $29,200 $65,157 interest 684 State/fed taxes, FICA (16,115)
49,642
1987: $35,317 $25,047 $60,364 interest 699 State/fed taxes, FICA (11,271)
49,792
1986: $33,016 $21,865 $54,881 CT Page 7622 interest 2,759 State/fed taxes, FICA (15,696)
41,944
1985: $26,126 $22,559 $48,683 interest 3,012 State/fed taxes, FICA (13,369)
38,326
1984: $25,433 $19,168 $44,601 interest 1,990 State/fed taxes, FICA (12,120)
34,471
'84-'95 478,338 (70%) 209,782 (30%) 688,120 (100%) Total interest 11,257 Unemployment 14,219 State/fed taxes, FICA (177,564)
536,032 '90-'95 284,805 (81%) 65,370 (19%) 350,175 (100%) Total interest 1,513 Unemployment 14,219 State/fed taxes, FICA (93,592)
272,315
This court has considered the provisions of § 46b-81 (c) regarding the issue of property, and has considered the provisions of § 46b-82 regarding the issue of alimony, and has considered the provisions of § 46b-62 regarding the issue of attorney's fees.
ORDERS
The court enters the following orders:
A. BY WAY OF DISSOLUTION
 1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF ALIMONY
 1. No alimony is awarded in favor of either party. CT Page 7623
 2. The defendant is to make available COBRA benefits for the benefit of the plaintiff for the maximum period allowed by law. The parties are to divide equally the monthly cost for such benefit.
C. BY WAY OF PROPERTY ORDERS
 1. The 1997 Subaru shown on the plaintiff's financial affidavit is awarded to the plaintiff. She is to pay the loan balance and to hold the defendant harmless therefrom.
 2. All bank accounts shown on the plaintiff's financial affidavit are award to the plaintiff.
 3. The 401K plan shown on the plaintiff's financial affidavit is awarded to the plaintiff.
 4. The defendant's naval reserve retirement is awarded to the defendant.
 5. All liabilities shown on the defendant's financial affidavit are to be paid by the defendant and he is to hold the plaintiff harmless therefrom.
 6. The defendant is ordered to quitclaim to the plaintiff all of his right, title and interest in the condominium located at 71 Deer Run, Bethel, Connecticut. The plaintiff is responsible for all common charges and other expenses related to such condominium and is to hold the defendant harmless therefrom. This transfer is to take place by August 1, 1997. The defendant has a greater earning capacity than the plaintiff. He will, therefore, have a greater opportunity for future acquisition of capital assets.
 7. The 1994 Honda shown on the defendant's financial affidavit is awarded to the defendant. He is to pay the loan balance and hold the plaintiff harmless therefrom.
 8. The parties entered into an agreement marked as court exhibit A regarding the division of CT Page 7624 furniture and furnishings. The court approves of that agreement and enters orders in accordance with that agreement.
 9. The bank account shown on the defendant's financial affidavit is awarded to the defendant.
 10. The life insurance policies shown on the defendant's financial affidavit are awarded to the defendant.
 11. The 401K plan shown on the defendant's financial affidavit is awarded to the defendant.
D. BY WAY OF ATTORNEY'S FEES
 1. No attorney's fees are awarded in favor of either party.
E. MISCELLANEOUS ORDERS
 1. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature and filing.
Axelrod, J.